1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GARY ALLEN BORTIS,

11            Petitioner,              No. 2:11-cv-3186-KJM-EFB P

12        vs.

13   G. SWARTHOUT,

14            Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner proceeding without counsel on a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2007 judgment of conviction

18   entered against him in the Placer County Superior Court on charges of first degree murder with

19   the use of a firearm and eight counts of possessing illegal weapons.  He seeks relief on the

20   grounds that: (1) the trial court violated his right to due process in failing to give several jury

21   instructions; (2) his Fourth Amendment right to be free from unreasonable search and seizure

22   was violated by the warrantless entry into his residence; and (3) his trial and appellate counsel

23   rendered ineffective assistance.  Upon careful consideration of the record and the applicable law,

24   the undersigned recommends that petitioner's application for habeas corpus relief be denied.

25   /////

26   /////

1

## I.    Background[1]

Escalating tensions over a boundary dispute ended with Lawrence Ficarra lying dead of gunshot wounds in the road between his property and that belonging to defendant Gary Allen Bortis.  There was no question that Bortis was the person who shot Ficarra.  Instead, the principal issue for the charge of murder concerned whether Bortis shot Ficarra in defense of his live-in girlfriend, defendant Maryanne Stein.  On trial at the same time, Stein defended against the charge of being an accessory after the fact to Ficarra's murder.  Stein contested the prosecution's argument that she was an accessory due to her concealment of the murder weapon after the shooting and due to her fabrication of a story that Ficarra was shot only after he started to strangle her.

A jury convicted Bortis of first degree murder and found that he personally and intentionally discharged the firearm causing the death.  (Pen.Code, §§ 187, 12022.53, subd. (d).)FN1  The jury also convicted him of eight counts of possessing illegal weapons.  Stein was convicted of being an accessory after the fact to Ficarra's murder. (§ 32.)

> FN1. Undesignated statutory references are to the Penal Code.

On appeal, Bortis contends the trial court erred by (1) failing to instruct regarding voluntary manslaughter based on imperfect defense of another, (2) denying his motion to suppress the evidence of the numerous guns discovered by the deputies during a protective sweep of Bortis's house, (3) allowing the evidence of guns not used in the shooting of Ficarra to be considered in connection with the murder charge, (3) instructing the jury with CALCRIM No. 224; and (4) ordering two trial recesses of 10 days each.

Stein also appeals, contending (1) the evidence was insufficient to convict her of being an accessory to murder, and (2) the trial court erroneously used elements of her accessory offense to deny her request for probation.

We shall affirm the convictions for Bortis and Stein in addition to the trial court's denial of probation for Stein.  However, we shall order Stein's judgment modified to credit her with four days of custody credit to which she is entitled under section 4019, subdivisions (b) and (c).

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

## FACTUAL AND PROCEDURAL HISTORY

### Property Dispute

At trial, the prosecution argued that Bortis murdered Ficarra in the first degree upon premeditation, or, at a minimum, in the second degree upon provocation.  To this end, the prosecution introduced evidence showing that Bortis and Stein, both of whom were school bus drivers, had lived on Boone Lane in Loomis since 2002.

Boone Lane is a dirt-gravel road on which there are seven or eight houses.  In January 2005, Ficarra purchased a nearly three-acre parcel that abutted Boone Lane.  Ficarra intended to subdivide his property and sell the parcels.  Ficarra's property had two access routes: Saunders Avenue and Boone Lane.

Shortly after Ficarra bought his property, Bortis informed him that Boone Lane crossed about 10 feet onto Bortis's property.  Over the ensuing months, the effect of Bortis's boundary claim on Ficarra's access along Boone Lane led to many arguments between the two men.  Some of these altercations resulted in law enforcement intervention.

Two incidents drawing law enforcement response occurred on April 29 and 30, 2005.  In the first incident, Bortis and Stein attempted to drive across Ficarra's parcel using a purported easement.  Ficarra stood in their way while directing a business associate who was visiting him, Steve Dahle, to drive Ficarra's vehicle toward the defendants' vehicle.  Defendants claimed that Dahle hit them; Dahle maintained he only blocked them; the independent evidence favored Dahle.

In the second incident, on April 30, 2005, Ficarra pulled out a fence post that Bortis had placed, and threatened Stein with a hammer.

### Shooting

The following seven persons were the pivotal witnesses regarding the shooting, which occurred around 6:25 p.m. on September 8, 2005: Deborah Mendocino, a coworker and friend of the defendants; Amanda Davis and Tracy Baker, who lived together on Boone Lane and were neighbors of Ficarra and defendants; the two defendants themselves; and Deputies Christina Woo and Trek Sinclair, who initially responded to the shooting.  We will take these persons in order.

Mendocino visited with defendants after work on their porch but left just before the shooting occurred.  She was privy, however, to the following: Bortis mentioned to her that he was being harassed

by a neighbor (Ficarra); and he showed her a handgun he had lodged in the back of his pants, saying he carried it "to help protect [Stein and him]" from Ficarra.

Mendocino also saw Ficarra park in a carport on Boone Lane across the street, get out, grab an orange cone (of Bortis's) from the middle of the road, and throw it. This led to a verbal spat between Ficarra and Bortis about Ficarra lacking permission to be on the property. It was at this point that Mendocino received a call from her family and left. Stein claimed that Ficarra blocked Mendocino's exit, but Mendocino testified otherwise.

Shortly before the shooting, Ficarra had gone to Davis's and Baker's home to talk to Baker. When Davis told Ficarra that Baker was not home, Ficarra sped away toward Bortis's house. Davis saw Ficarra throw the cone toward Bortis's driveway. Davis then walked toward the defendants' home to make sure they were okay; they had a visitor who was just leaving (i.e., Mendocino). Davis and Baker had their own property dispute with Ficarra; Davis knew Ficarra was aggressive and caused problems.

When Davis saw Ficarra approaching her and defendants on foot, she ran behind defendants' house to avoid him. While behind the house, Davis called Baker on a cell phone. Baker was on her way home from work. As Davis and Baker chatted over the phone for several minutes, Davis heard male voices yelling obscenities out front and saying something about money. Davis later heard a quick succession of gunshots and heard Bortis yell, "Call 911." Davis saw Baker run toward defendants' driveway, so she came around front and found Bortis and Stein standing next to one another with Ficarra bent over near his opened driver's door.

For her part, Baker, while driving up Boone Lane, saw Ficarra grab the cone and toss it onto Bortis's property. As she passed, Bortis smiled and gestured as if to signify that she was a witness to the toss.

Baker drove past, watching the scene unfold in her rear view mirror. She could not hear anything with her windows up and with Davis on the phone, but she could tell that Ficarra was "pissed off" by the way he was gesturing and storming back to his car. Ficarra got into his vehicle. Initially, it looked as if Ficarra was going to leave the area, but then he stopped and turned back toward Baker's house on Boone Lane.

At this point, Baker was parking in her driveway and getting out of her car (she was about 75 yards away). She saw Stein jump in front of Ficarra's vehicle as Bortis pointed at a sign that stated: "Access by permission only." Ficarra tried to drive his car around Stein on both sides, but she moved to block him.

4

Baker then saw Ficarra's car door open quickly.  At this point, Baker reached into her car to grab her purse on the passenger seat; this took about three to five seconds.  During this interval, she heard a rapid series of gunshots.  Baker emerged from her car to see Bortis standing two to three feet away from Ficarra's opened driver's door, holding a gun pointed down at a 45-degree angle.  Moving to get a better view, Baker saw Stein standing to the right of Bortis.

Baker ran toward Bortis saying, "What the hell, Gary?"  Bortis said, "Call 911."  Ficarra was lying on the ground under the opened driver's door.  Bortis was pacing and had a look of shock on his face.  Baker had seen Stein run toward the house and then come out holding a phone.  Baker asked Stein if she had called 911.  Stein said she had, and pulled down her shirt, saying, "Look, he tried strangling me."  In the past, Bortis had shown Baker a pistol he kept "handy" because Ficarra "scare[d]" him (this pistol resembled the shooting weapon).

Placer County Sheriff's Deputies Christina Woo and Trek Sinclair initially responded to the shooting.  After checking Ficarra and handcuffing Bortis, who acknowledged being the shooter, Woo asked where the gun was.  Stein replied, "I'll show you," and led Deputy Sinclair to her and Bortis's house, where she retrieved the weapon, a 9mm semi-automatic.  Stein refused to allow Deputy Sinclair inside.

**Investigation**

Bortis fired 11 rounds.  A shooting expert who test-fired a gun identical to Bortis's was able to shoot 11 rounds in 3.4 seconds.  The gun that Stein had given to the officers was the shooting weapon.

Ficarra had eight entry wounds, in his left arm and left torso.  The forensic pathologist who performed Ficarra's autopsy concluded that at least three of the wounds were inconsistent with Ficarra's being shot while extending his arms to choke Stein; instead, Ficarra's left arm was down.  The pathologist acknowledged, however, that he could not tell Ficarra's posture from the wounds alone.

There was no blood found in the vehicle's interior consistent with Ficarra's being shot while sitting inside the vehicle.  A defense forensic analyst opined that Ficarra was outside the car for at least two of the shots, and probably outside for all.  But the lead detective on the case, based on his training and experience with blood spatter evidence, believed that Ficarra was in his vehicle when he was shot.

/////

Evidence showed that Bortis was about six feet away from Ficarra's vehicle at some point during the shooting.

Throughout the investigation, Stein consistently maintained that Ficarra was choking her when Bortis fired the shots.  Investigators were skeptical about the choking because (1) Stein could not clearly articulate where she was when Bortis fired; (2) Stein said that Ficarra was in front of her and Bortis was behind her during the fusillade; (3) investigators could not comprehend how she could have been in such a position yet have escaped without injury or some blood spatter from the shooting; and (4) during questioning Stein continuously rubbed her neck, and her neck injuries were more aggravated on the day after the shooting.  Fingernail scrapings taken from Ficarra did not include any foreign DNA.

Five days after the incident, Bortis called Stein from a jailhouse phone.  During the recorded conversation, Bortis provided Stein with his view of details about the incident as follows:

"BORTIS: . . .  Okay.  You need to call Triple A Insurance, that claim agent.

"STEIN: [Inaudible] Okay that number is two is Triple A?

"BORTIS: Yeah, the one that had the claim agent that.

"STEIN: Yeah.

"BORTIS: the first time he ran into us.

"STEIN: Uh hum.

"BORTIS: Now you get to make another claim.  You got to make another claim because he hit you with that car.  I saw you buckle when he hit you, Mary Ann, and you, and you, and you looked at me and then you got pissed off and that's when you got in him.

"STEIN: Oh.

"BORTIS: and you said, "You son of a bitch," and that's the place, and then I..

"STEIN: [Inaudible]

"BORTIS: see he got, well I don't want to go onto [sic] it right now on the phone.

"STEIN: Yeah, I don't remember all these, I remember him hitting me.

6

"BORTIS: He hit you in the, he hit you in the left thigh and it dropped you almost to your knees.

"STEIN: Well I have a, I had a mark on my knee that like I hit the ground.

"BORTIS: Mary Ann, he, listen to me,..

"STEIN: and then rowhere [sic] a rock or something [Inaudible]

"BORTIS: listen to me.  You need to go in and have that checked.  You got hit in the thigh, and you looked at me and go, "He hit me." I go, and I was talking into the cell phone like I was on 911.

"STEIN: Uh huh.

"BORTIS: That's what enraged that S.O.B. because he thought he was done for then.  He hit you with the car, okay?  I was like, 'Oh my God.  This is . .

"STEIN: Yeah, I told the police that and that he hit me, and that the car hit me in the arm with the mirror as well and that then he got out of his car and he said he was going to kill me.  [Inaudible] me.

"BORTIS: [Inaudible] no, let me tell you, as you were complying with what I was asking you to do and get out of there.

"STEIN: I told him [Inaudible].

"BORTIS: he came around that's when he came at me.  I backed off and he just swung around a little bit and grabbed you. That was it.

"STEIN: Okay.

"BORTIS: It was like a two-step thing then.  Boom boom boom.

"STEIN: They wanted me to fuckin' draw a map who was there.

"BORTIS: No, fuck the map.

"STEIN: I said, 'I don't know.'  I, you know, you're fuckin' wanting me to say shit I don't know . .

"BORTIS: It happened

"STEIN: the answer to.

/////

/////

7

"BORTIS: that's when I told them, "You know what?  It happened in . .

"STEIN: So fast.

"BORTIS: 3, 3-1/2 seconds.  It was boom.'

"STEIN: And, you know Tracy, she told them everything.  She said and then I bent down to get my purse and like the most important 2, 3 seconds it was over.  It had already happened.

"BORTIS: That's exactly, exactly, exactly it.

"STEIN: Yes, and that..

"BORTIS: Okay, stop, stop talking, stop talking.

"STEIN: [Inaudible]

"BORTIS: They're, they're recording."

**Guns**

In addition to murder, Bortis was convicted of possessing two machine guns, four assault weapons, and armor-piercing ammunition.

In Bortis's house and storage shed, deputies found these weapons along with a slew of others (in fact, about 50 others scattered throughout the house-mostly rifles and handguns; many of them loaded).  Merely listing these weapons takes nearly two pages of double-spaced briefing.  Evidence of all these weapons – in the form of photographs, accompanying descriptions, or the possession-charged weapons themselves – was admitted at trial.

**Bortis's Defense**

The defense argued that Ficarra had repeatedly threatened Bortis over an increasingly bitter property dispute, and that just before the shooting Ficarra attacked and started to strangle Stein.

Four former neighbors of Ficarra testified about his aggressiveness before he moved to Loomis to become a neighbor of Bortis and Stein.

/////

/////

/////

8

Jon Sagen had been Ficarra's neighbor in Aptos.  He testified that Ficarra once threatened him after Ficarra took a chain saw into a park, and once threateningly drove a skip loader within a foot of Sagen, telling Sagen, an elderly man, to never put his foot on Ficarra's property.  Sagen was so scared of Ficarra that he borrowed a gun from a friend for protection.  Sagen had never had a gun in his house before.

Arlos Anderson had also been Ficarra's neighbor in Aptos.  The two had words about structural irregularities on Ficarra's property.  Ficarra, who said he was a Hell's Angel, threatened Anderson nearly every day, including with physical harm.

Robert Carmichael had been a neighbor of Ficarra on a lake in Watsonville.  While in his competition ski boat, Ficarra would cut in front or run alongside of other boats in a threatening manner.  Once, Ficarra drove his boat straight at Carmichael's boat, turning away only at the last moment; when Carmichael retreated to the dock, Ficarra verbally humiliated him.

Lawrence Lease had been Ficarra's neighbor in Watsonville and ran a plumbing supply company that Ficarra, a plumbing contractor, used.  When Lease informed Ficarra that he no longer wanted Ficarra's business, Ficarra began threatening Lease as well as Lease's wife, including at their home.  Believing that Ficarra wanted to kill him, Lease obtained a restraining order and, for the first time in his life, began carrying a loaded gun for protection.

Three of Ficarra's neighbors in Loomis lent their voices to this chorus of fear: Donnie Joe Karr, David Hammond, and Bortis (and they described the plight of a fourth neighbor, an elderly quadriplegic who died before trial, Keith Henry).

When Karr, Hammond, and Keith Henry (the elderly quadriplegic who died before trial) all refused Ficarra's demands that they remove structures that, according to Ficarra (but disputed by surveys), encroached upon Ficarra's Loomis property, Ficarra confronted and threatened them.

Bortis testified on his own behalf, explaining that Bortis knew of these confrontations and threats, and had been on the receiving end of this behavior as well.  Ficarra had often threatened Bortis, including threatening to kill him.  The two had many heated arguments over boundary and easement issues.  And twice Ficarra had apparently tried to run down Bortis with vehicles.  Bortis began carrying a gun whenever he worked outside or Ficarra was around.

Bortis testified that the events surrounding the shooting started when Ficarra repeatedly lurched toward Stein with his car and then hit the brakes.  On the third such lurch, Ficarra grazed Stein on her

9

left hip with his bumper and she "kind of crumbled" but did not fall.  Ficarra was screaming at Stein, "I'm going to kill you, you fucking bitch."

Bortis saw Ficarra's car door fly open, and, within a second to a second-and-a-half, Ficarra got out of his car and began choking Stein, who was "right there."  Bortis yelled, "Stop!"  Bortis estimated that it had taken Ficarra no more than a second and a half to get out of his car and start choking Stein.  Bortis then fired the gun toward Ficarra's mid-section.

After Bortis had fired one or two shots, Ficarra assumed a boxer's stance toward Bortis.  Bortis continued to shoot "[t]rying to stop him."

The defense called a forensic scientist who testified that the autopsy, bullet trajectories, and deputies' reports indicated that Ficarra was outside his vehicle when at least some – and probably all – of the shots were fired.

**Stein's Defense**

Stein also testified on her own behalf and largely confirmed Bortis's account of the circumstances of the shooting.  She testified that on the day of the shooting she put a traffic cone into Boone Lane to prevent Ficarra from using the road.  She did so "[b]ecause I was standing up for what I believed was right."  Stein fell to the ground when Ficarra's car bumped her.  Shortly thereafter, Ficarra exited his car with a "crazy look."  Ficarra grabbed Stein around the neck.  Bullets then "whizz[ed] by" her.

Bortis told Stein to put the gun away and call 911.  Stein tossed the gun into a planter box as she ran to get a phone.  Realizing that a planter box was not a good place to leave the gun, she took it to the laundry room inside the house.

When a Sheriff's deputy instructed her to get the gun, she went inside the house to retrieve it.  The deputy wanted to enter the house, but she refused him permission.  However, Stein did not hesitate to retrieve the gun.  Stein needed only a short amount of time to retrieve the gun.

Deputies interviewed Stein several times, and she repeatedly told them that she was being strangled immediately before Ficarra was shot.  Stein quickly got the sense that the deputies were "done with [her]" because they thought she was lying.

**Closing Arguments**

In response to a motion by Stein for judgment of acquittal at the close of the evidence, the prosecutor stated: "The direct and

circumstantial evidence that has been introduced over the last four weeks proves beyond a reasonable doubt that the defendant, Gary Bortis, murdered the victim, Lawrence Ficarra.  That the Codefendant Stein was present and an eyewitness to that occurrence and picked up the murder weapon and ran it into the house and prevented a deputy from going into the house with her to retrieve it.  And the compelling and strong inference is that she did

so to help her longtime live-in boyfriend, Gary Bortis, avoid arrest, prosecution and conviction for violation of [ ] section 187 murder."

During closing arguments, the prosecutor likewise argued that "this claim that Maryanne Stein made that Ficarra leapt out of the car and grabbed her around the throat and strangled her at that time that Ficarra was shot is a lie."  The prosecution emphasized that Tracy Baker, a neighbor who saw most of the confrontation and shooting, testified that "[s]he never saw any contact whatsoever between Lawrence Ficarra and Maryanne Stein."  Instead, the prosecution argued, Stein first concocted the strangling story after the shooting.  Bortis quickly adopted the fabrication when they called 911 after the shooting.  "Stein tells the dispatcher, 'He was choking me.'  What does Stein do?  She hands the phone to Bortis, and Bortis repeats the same claim right there having heard it from Maryanne Stein."

Stein's counsel noted that he anticipated the prosecution to assert a separate basis for the accessory charge based on the concealment of the gun:  "And there are two theories that I expect to hear on rebuttal from the prosecution because I didn't hear them very clearly if at all during his closing argument.  [¶]  One is that [ ] Stein takes the gun and puts in into the laundry room versus the kitchen or on the step."  Defense counsel noted that Stein immediately responded to the deputy's request to produce the weapon by saying, "I'll show you."

Thereafter, the prosecution argued: "I believe the first room you come into when you go through that back door is you're in the kitchen and from there, there's a laundry room somewhere farther back in there.  So the planter box isn't good enough [for the gun], and the kitchen table isn't good enough.  The kitchen counter isn't good enough.  She goes into the laundry room and for some reason, which I don't think is adequately explained, she does not want Officer Sinclair to go into that laundry room and see where the gun is.  That is not the behavior of someone who is cooperating with the police.  [¶]  Now, she again acting on impulse and instinct, she decides to, I will say, I will submit to you she's hiding that murder weapon."

/////

11

> Again the prosecution emphasized the incredible nature of the strangling story, noting that "Maryanne Stein would have had to come out of that hail of gunfire unscathed.  And we've seen the – we've seen the photos.  She's got the glasses, the necklace, and the earrings, and there's no blood spatter much less bullet wounds on her.  But that's her story."
>
> **Sentencing**
>
> Following their convictions, Bortis was sentenced to a state prison term of just over 56 years-to-life, 50 years of which comprised the first degree murder conviction and the firearm discharge enhancement (each 25-years-to-life).  Stein was sentenced to a low term of 16 months in state prison.
>
> Bortis and Stein each timely filed an appeal, which we have consolidated.

ECF No. 24 at 48-54.

After the California Court of Appeal issued its opinion, as modified after a petition for rehearing, petitioner filed a petition for review in the California Supreme Court.  Pet., Ex. G.  That petition was denied.  ECF No. 15 at 33.[2]  Petitioner subsequently filed a petition for writ of habeas corpus in the California Superior Court, alleging jury instruction error and ineffective assistance of appellate counsel.  Pet., Ex. I.  The Superior Court denied that petition, reasoning that petitioner's jury instruction claim had been raised and denied on appeal and that his claim of ineffective assistance of counsel was not stated with sufficient particularity.  Pet., Ex. J.

Petitioner subsequently filed a petition for a writ of habeas in the California Supreme Court, alleging jury instruction error and ineffective assistance of trial and appellate counsel.  *See* ECF No. 17-6.  That petition was summarily denied.  ECF No. 15 at 34.

## II.   Analysis

### A.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28

---

[2]   Justices Kennard and Werdegar were of the opinion that the petition should be granted.  *Id.*

U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision.  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

/////

/////

/////

/////

1    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

2    the writ if the state court identifies the correct governing legal principle from the Supreme

3    Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3]

4    *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

5    F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

6    simply because that court concludes in its independent judgment that the relevant state-court

7    decision applied clearly established federal law erroneously or incorrectly.  Rather, that

8    application must also be unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v.*

9    *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

10   habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

11   the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

12   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

13   of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

14   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

15   condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

16   state court's ruling on the claim being presented in federal court was so lacking in justification

17   that there was an error well understood and comprehended in existing law beyond any possibility

18   for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.

19        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

20   court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

21   527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

22   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

23   /////

---

24
25        [3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,
26   384 F.3d 628, 638 (9th Cir. 2004)).

1   § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

2   considering de novo the constitutional issues raised.").

3          The court looks to the last reasoned state court decision as the basis for the state court

4   judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

5   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

6   previous state court decision, this court may consider both decisions to ascertain the reasoning of

7   the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When

8   a federal claim has been presented to a state court and the state court has denied relief, it may be

9   presumed that the state court adjudicated the claim on the merits in the absence of any indication

10  or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. This

11  presumption may be overcome by a showing "there is reason to think some other explanation for

12  the state court's decision is more likely." *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

13  803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims

14  but does not expressly address a federal claim, a federal habeas court must presume, subject to

15  rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___, U.S.

16  ___, ___, 133 S.Ct. 1088, 1091 (2013).

17         Where the state court reaches a decision on the merits but provides no reasoning to

18  support its conclusion, a federal habeas court independently reviews the record to determine

19  whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.*

20  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

21  review of the constitutional issue, but rather, the only method by which we can determine

22  whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.

23  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

24  there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

25         When it is clear, however, that a state court has not reached the merits of a petitioner's

26  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

15

1   habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

2   F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

3       **B.  Petitioner's Claims**

4           **1.  Jury Instruction Error**

5               **a.      Failure to Instruct on Voluntary Manslaughter Based on**
                        **Imperfect Defense of Another**

6

7       Petitioner's first claim for relief is that the trial court violated his right to present a

8   defense when it failed to give a sua sponte jury instruction on imperfect defense of another.  ECF

9   No. 15 at 10-12.  He argues that the trial court should have informed the jurors that his offense

10  could be reduced to manslaughter if they found that he shot and killed Ficarra based on an actual

11  but unreasonable belief that deadly force was necessary to prevent great bodily injury to Stein.

12  *Id.*  Petitioner also contends that the trial court "failed to instruct the jury that every element of

13  the offense must be proven beyond a reasonable doubt," and that this failure lowered the

14  prosecutor's burden of proof.[4]  *Id.* at 11.

15      The California Court of Appeal concluded that the trial court erred in failing to give a sua

16  sponte jury instruction on the lesser included offense of voluntary manslaughter based on

17  imperfect defense of another, but that the error was harmless.  The court reasoned as follows:

18              Bortis contends the trial court erred prejudicially by failing to
                instruct the jury on the lesser included offense of voluntary
19              manslaughter based on imperfect defense of another – i.e., an
                actual but unreasonable belief in the need to defend Stein from
20              imminent peril from Ficarra.  We agree that the court erred in
                failing to instruct on voluntary manslaughter, but we find it is not
21              reasonably probable that a result more favorable to Bortis would
                have occurred in the absence of the error.  (*People v. Breverman*
22              (1998) 19 Cal.4th 142, 149, 154, 162, 178, 77 Cal.Rptr.2d 870,
                960 P.2d 1094 (*Breverman*).)

23

24

25      [4] By this latter argument, petitioner is apparently claiming that the trial court violated his
    right to due process in failing to instruct the jury that an honest but unreasonable belief in the
26  necessity to defend another negates malice.

## A

We begin by addressing the Attorney General's argument that any error in the court's failure to instruct on voluntary manslaughter was invited by Bortis's counsel.

A trial court's "'obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.'"  (*Breverman, supra*, 19 Cal.4th at p. 154, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)  Even so, "a defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence.  [Citations.]  In that situation, the doctrine of invited error bars the defendant from challenging on appeal the trial court's failure to give the instruction."  (*People v. Beames* (2007) 40 Cal.4th 907, 927, 55 Cal.Rptr.3d 865, 153 P.3d 955.)

As respondent points out, Bortis's counsel initially argued against giving the instruction on the lesser included offense of voluntary manslaughter based on imperfect defense of another.  In so arguing, defense counsel sought to hold the prosecutor to the theory of the case that the prosecutor articulated during his opening statement, namely that Ficarra was shot inside his car in cold-blooded execution-style murder.  Defense counsel reasoned that the prosecution's opening statement allowed only for conviction of an execution-style murder of Ficarra as he sat in his car, or a justifiable homicide based on perfect defense of Stein.

As trial went on, Bortis's counsel recognized that the prosecution's evidence suggested Ficarra was outside his car when he was shot.  Thus, Bortis's counsel indicated that instruction on voluntary manslaughter based on imperfect defense of another would be appropriate if the prosecutor were to acknowledge this evidence in his closing argument.  Counsel for Stein stated to the court:

"[Defendant Stein's counsel]: I would suggest we reserve on the manslaughter instructions until we hear the theory and the methodology whereby the prosecution is going to argue [ ] Bortis' acts and how they constitute murder, because my concern is he may dance very close to an imperfect self-defense theory which might necessitate the need for additional instructions."

The trial court proceeded to inquire of the prosecutor whether he intended to present an argument implicating the issue of imperfect defense of another. The following colloquy ensued:

/////

"[Prosecutor]: I'm sorry. The problem is?

"THE COURT: The problem is, if you're going to argue that he used excessive force in the defense of [ ] Stein, we raise the whole issue of imperfect self-defense, I think."

During closing arguments, the prosecutor would indeed retreat from his opening statement's claim of cold-blooded murder while Ficarra sat inside his car.  However, the trial court did not instruct on voluntary manslaughter based on imperfect defense of another.

Having retreated from an initial argument against a voluntary manslaughter instruction to noting that such instruction might be necessary based on the prosecution's revision of its theory of the case, counsel for Bortis cannot be held to have invited error in failure to give a voluntary manslaughter instruction.

**B**

The trial court instructed only on murder and on the justifiable homicide theory of perfect defense of another (i.e., an actual and reasonable belief in the need to defend another).  Bortis contends the trial court was also required to instruct sua sponte on voluntary manslaughter.

The California Supreme Court has explained that proof of imperfect self defense precludes conviction of first degree murder: "Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the [murder] element of malice that otherwise inheres in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder."  (*Breverman, supra*, 19 Cal.4th at p. 154, 77 Cal.Rptr.2d 870, 960 P.2d 1094.) FN2 Consequently, evidence indicating a defendant's honest but unreasonable belief of the need to engage in self-defense or defense of another requires a jury instruction on voluntary manslaughter. (*See ibid.*)

> FN2. We agree with the trial court that there was insufficient evidence to warrant an instruction on voluntary manslaughter based on heat of passion. Bortis does not argue to the contrary.

The *Breverman* court declared that "'[t]he obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.  [Citations.]  Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a

lesser included offense.'" (*Breverman, supra*, 19 Cal.4th at pp. 154-155, 77 Cal.Rptr.2d 870, 960 P.2d 1094; *People v. Golde* (2008) 163 Cal.App.4th 101, 115, 77 Cal.Rptr.3d 120.)

The elements of voluntary manslaughter based on imperfect defense of another are: (1) the defendant actually believed that someone else was in imminent danger of being killed or suffering great bodily injury and (2) the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; but (3) at least one of those beliefs was unreasonable. (CALCRIM No. 571, Voluntary Manslaughter: Imperfect Self-Defense-Lesser Included Offense.)  As the California Supreme Court has explained, "the doctrine of imperfect self-defense [requires] '[a]n honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter.' "(*People v. Rogers* (2006) 39 Cal.4th 826, 883, 48 Cal.Rptr.3d 1, 141 P.3d 135, quoting People v. Flannel (1979) 25 Cal.3d 668, 674, 160 Cal.Rptr. 84, 603 P.2d 1, first brackets added.)  In short, perfect defense of another requires both an actual and a reasonable

belief in the need to defend another, while imperfect defense of another requires only an actual (and "honest") belief.

As the use notes to the CALCRIM jury instructions on perfect self-defense and on imperfect self-defense (and, by extension, to defense of another), explain: "Most courts hold that an instruction on imperfect self-defense is required in every case in which a court instructs on perfect self-defense [as noted, the trial court here instructed on perfect self-defense]."  (Judicial Council of Cal.Crim. Jury Instns. (2006-2007) Bench Notes to CALCRIM No. 571, p. 377, *bolding omitted; see also*, CALCRIM, *supra*, Related Issues to CALCRIM No. 505, p. 251.)

If substantial evidence indicates an "actual belief" for purposes of perfect defense of another, sufficient evidence of an actual belief exists to require instruction on voluntary manslaughter due to imperfect defense of another.  (*People v. De Leon* (1992) 10 Cal.App.4th 815, 824, 12 Cal.Rptr.2d 825 ["If there was substantial evidence of imperfect self-defense not inconsistent with the defense theory of the case, the trial court had a sua sponte duty to give such an instruction"].)  In short, an instruction on imperfect self-defense (or defense of another) is ordinarily required when a court instructs on perfect self-defense.  (*Ibid.*)

In *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 62 Cal.Rptr.2d 345, the Court of Appeal held that an imperfect self-defense instruction was not required when a defendant's account of the crime allowed only for an acquittal based on

justifiable homicide or first degree murder. (*Id.* at p. 1275, 62 Cal.Rptr.2d 345; *see also id.* at pp. 1272-1274, 62 Cal.Rptr.2d 345.) The defendant in *Rodriguez* claimed to have acted in perfect self-defense against a victim who had earlier attacked and slashed defendant's face with a knife. (*Id.* at p. 1272, 62 Cal.Rptr.2d 345.) The trial court instructed on murder, voluntary manslaughter based on heat of passion, and involuntary manslaughter. (*Ibid.*) The Court of Appeal rejected the argument that the trial court should also have instructed on voluntary manslaughter due to imperfect self-defense "because no request was made, and because it was not "'clearly demanded by the evidence."'" (*Ibid., quoting People v. Barton* (1995) 12 Cal.4th 186, 197, 47 Cal.Rptr.2d 569, 906 P.2d 531.) In contrast to *Rodriguez*, the evidence presented in this case did not constrain the jury to an "either/or" decision. As we shall explain, substantial evidence in this case warranted instruction on imperfect defense of another.

**C**

The Attorney General contends this case lacks substantial evidence of imperfect defense of another. Respondent argues: "Absent evidence that Ficarra was choking Stein, the evidence simply provides no basis for Bortis to have had an [actual] belief, reasonable or otherwise, that Ficarra was an imminent threat." However, at the time the court had to decide on jury instructions, the jury had heard evidence that Ficarra was choking Stein.

The evidence of imperfect defense of another was "'substantial enough to merit [a jury's] consideration.'" (*See Breverman, supra*, 19 Cal.4th at p. 162, 77 Cal.Rptr.2d 870, 960 P.2d 1094.) Witnesses testified that Ficarra angrily got out of his vehicle to confront Stein, and that Ficarra had an extensive history of threats and violence when confronting neighbors, including Bortis. This evidence encompassed (1) Baker's testimony that Ficarra was "pissed off" and that Ficarra's car door opened quickly; (2) Bortis's and Stein's testimony about Ficarra's driving toward Stein, about Ficarra's death threats to Stein during this encounter, and about his car door flying open; and (3) the fact that the encounter was based on the long-boiling property dispute between Ficarra and Bortis/Stein. The extensive history of Ficarra's threats and violence in confronting neighbors came from the neighbors themselves, a history Bortis was aware of concerning the Loomis neighbors and which he had experienced firsthand. And Stein and Bortis had both testified that Ficarra was choking Stein.

In sum, Bortis's jury was presented with substantial evidence of imperfect defense of another. Since courts are truth-seeking institutions rather than gambling halls, the trial court had the duty to instruct sua sponte on imperfect defense of another. (*People v. St. Martin* (1970) 1 Cal.3d 524, 533, 83 Cal.Rptr. 166, 463 P.2d 390.) Accordingly, we conclude the trial court erred in failing to

instruct on voluntary manslaughter based on imperfect defense of another.

**D**

The question remains whether the failure to instruct on voluntary manslaughter was prejudicial.  (*Breverman, supra*, 19 Cal.4th at p. 165, 77 Cal.Rptr.2d 870, 960 P.2d 1094.)  "[S]uch misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome."  (*Ibid.*, citing Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243.)  In other words, we must affirm unless this court, "'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson, supra*, 46 Cal.2d at p. 836, 299 P.2d 243.)  Here, our vantage point is different from that of the trial court when it instructed the jury.  Now, we have the benefit of the jury's verdicts.  When we factor in the verdict against Stein, we conclude the trial court's failure to instruct on voluntary manslaughter premised on imperfect defense of another was harmless.

The same jury that convicted Bortis of first degree murder also convicted Stein of being accessory after the fact to the same murder.  In convicting Stein, the jury had to credit one of the two theories of her culpability advanced by the prosecution.  The prosecutor argued that Stein was an accessory because she had (1) hidden the murder weapon in the laundry room of Bortis's house after the shooting, and (2) fabricated the story about being strangled by Ficarra immediately before Bortis fired the fatal shots.

It is doubtful that the jury convicted Stein on the theory that she hid the murder weapon.  In response to the deputy's inquiry about the location of the handgun used to shoot Ficarra, Stein immediately responded: "I'll show you."  Without delay, Stein led Deputy Sinclair to the rear of Bortis's nearby house.  True, Stein did not allow the deputy to enter.  However, Deputy Sinclair reached a "compromise" with Stein.  Deputy Sinclair explained the compromise was "[t]hat I would remain where I was and she would retrieve the weapon."  Consistent with this compromise, Stein proceeded directly to the laundry room and retrieved the murder weapon.  Stein did not attempt to mislead the deputy about the murder weapon's use in the shooting or its location.

However, Stein did fabricate the strangling story.  The forensic evidence indicated that the lack of blood on her person and absence of injury due to the 11 rounds fired by Bortis at Ficarra – who allegedly had his hands around her neck – seriously undermined her strangling story.  When questioned at the scene of

the shooting, Stein continuously rubbed her neck but displayed no bruising. Fingernail scrapings from Ficarra were negative for any of Stein's DNA; and Stein's necklace, earrings, and glasses were all intact. Bruising on Stein's neck appeared the day after the shooting. At oral argument in this case, Stein's counsel confirmed:  "The accessory conviction was based on Stein's strangling story."  We agree.

Having decided that Stein conjured up the strangling story, the jury undoubtedly also concluded that Bortis was complicit with it.  The recorded conversation placed from jail confirmed that Stein and Bortis worked together to synchronize their stories about the shooting.  The likely conclusion that Bortis shared in the fabrication of the choking defense would have required rejection of the defense's theory that Bortis had an "actual" or "honest" belief that Stein needed to be saved from Ficarra's clutches.  (*See People v. Rogers, supra,* 39 Cal.4th at p. 883, 48 Cal.Rptr.3d 1, 141 P.3d 135.)  Given the jury's probable conclusion that defendants had concocted the strangling story, the jury would not have found Bortis to have committed voluntary manslaughter based on his honest but unreasonable belief in the need to defend Stein.  The probable rejection of Bortis's claim to an honest belief in the need to defend Stein renders harmless the trial court's failure to instruct sua sponte on imperfect defense of another.

Accordingly, the instructional error was nonprejudicial.

**E**

Bortis further argues that "the trial court's failure to instruct the jury that an honest but unreasonable belief in the necessity to defend negates malice was prejudicial error."  (*Capitalization omitted*.)  Seeking to avail himself of the more stringent analysis of prejudice required for errors for federal constitutional dimension, Bortis points out every criminal defendant enjoys a Sixth Amendment right to have the jury properly instructed on the legal requirements for each element of a charged offense.  (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278 [124 L.Ed.2d 182].)

Here, defendant's jury was instructed on malice as an element of murder when the trial court gave CALCRIM No. 520.FN3  Thus, the gravamen of defendant's contention is that the jury instruction on malice failed to inform the jury that imperfect defense negates malice.

> FN3. As given in this case, CALCRIM No. 520 instructed Bortis's jury as follows:
>
> "Defendant Gary Allen Bortis is charged in Count One with murder.

"To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] AND [¶] 3. He killed without lawful justification.

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with express malice if he unlawfully intended to kill.

"The defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The natural consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time." (*Italics omitted.*)

We addressed a similar contention in *People v. Genovese* (2008) 168 Cal.App.4th 817, 85 Cal.Rptr.3d 664 (*Genovese*). In *Genovese*, as in this case, the trial court instructed the jury on malice by giving CALCRIM No. 520. (*Id.* at p. 827, 85 Cal.Rptr.3d 664.) The defendant in *Genovese* assigned error to the fact that his jury was not told that "imperfect defense of another eliminates malice." (*Id.* at p. 830, 85 Cal.Rptr.3d 664.) We rejected the argument and explained that "[i]t is immaterial that the jury was not informed that, in fact, what was going on was that the jury was finding an 'absence of malice.' As Justice Corrigan has explained in her Preface to the CALCRIM jury instructions, 'our work reflects a belief that sound communication takes into account the audience to which it is addressed.' ([CALCRIM Jury Instns.] (2008) Vol. 1, Preface, p. xi.) 'Malice is another word of multiple meanings in criminal law . . . .' (1 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Elements, § 11, p. 213.) The definition of malice may be interesting to lawyers and judges and law professors, but it does not aid the task of lay jurors to inform them that, when the defendant acts in an honest but unreasonable belief in the need to defend another, he is acting without malice." (*Id.* at p. 831, 85 Cal.Rptr.3d 664.) We reject Bortis's contention for the

1       same reason.  CALCRIM No. 520 is not deficient because it fails
   to instruct the jury that imperfect defense negates the element of
2       malice for murder.

3       Even assuming instructional error as Bortis alleges, we would
   nonetheless affirm his murder conviction for lack of prejudice.  As
4       we have explained in part I-D, ante, the jury's rejection of Stein's
   story about being strangled by Ficarra necessarily meant that the
5       jury also disbelieved Bortis's claim of defense of another upon
   which he now premises his claim to an instruction regarding
6       imperfect defense.  Even under the standard of prejudice for a
   federal constitutional violation, we are able to declare any error in
7       the failure to instruct that imperfect defense of another eliminates
   malice is harmless beyond a reasonable doubt.  (*Chapman v.*
8       *California* (1967) 384 U.S. 18, 24 [17 L.Ed.2d 705].)

9  ECF No. 24 at 54-58.[5]

10       In general, a challenge to jury instructions does not state a federal constitutional claim.

11 *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.

12 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

13 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process

14 right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

15 To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so

16 infected the entire trial that the resulting conviction violates due process.'" *Prantil v. State of*

17 *Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir.

18 1987)).  In making its determination, this court must evaluate the challenged jury instructions

19 "'in the context of the overall charge to the jury as a component of the entire trial process.'" *Id.*

20 (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where the challenge is to a

21 refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because

22 "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement

23 of the law." *Henderson v. Kibbe*, 431 U.S. 145, 15 (1977).  *See also Villafuerte v. Stewart*, 111

24 F.3d 616, 624 (9th Cir. 1997).

25

26         [5] Justice Butz dissented from parts I-D, I-E, and III of the majority opinion. *Id.* at 65-66.

1    Because a failure to give a jury instruction is a trial error, petitioner is entitled to relief

2    only if he can show prejudice.  *Babb v. Lozowsky*, ___ F.3 ___, 2013 WL 2436532 (9th Cir. June

3    6, 2013).  Prejudice is shown for purposes of habeas relief if the trial error had a "substantial and

4    injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S.

5    619, 637 (1993).  A reviewing court may grant habeas relief only it is "'in grave doubt as to

6    the harmlessness of an error.'"  *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)).

7    When considering whether erroneous jury instructions constitute harmless error, "courts ask

8    whether it is reasonably probable that the jury would still have convicted the petitioner on the

9    proper instructions."  *Babb*, 2013 WL 2436532 at *13.

10    As set forth above, the California Court of Appeal found that the trial court's error in

11    failing to give a sua sponte jury instruction on voluntary manslaughter based on imperfect

12    defense of another was harmless.  The court reasoned that because the jurors apparently did not

13    believe that Ficarra tried to strangle Stein, they would necessarily have rejected petitioner's

14    argument that he shot Ficarra to protect Stein from being strangled.  Accordingly, the verdict

15    would not have been different even if petitioner's requested jury instruction had been given.

16    That reasoning is not "so lacking in justification that there was an error well understood and

17    comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-

18    87.  Fair minded jurist could disagree whether petitioner's jury would have rejected his defense

19    of imperfect defense of another in light of a jury verdict that reflected the jury's rejection of

20    petitioner's underlying premise.  Accordingly, habeas relief is not appropriate on this claim

21    Petitioner has also failed to demonstrate that he is entitled to federal habeas relief on his

22    argument that the trial court erred in failing to instruct the jury that imperfect defense of another

23    negates malice.  For the reasons explained by the California Court of Appeal, petitioner has

24    failed to demonstrate that the trial court's failure to give this instruction was erroneous or

25    prejudicial.  The Supreme Court has stated that "it is the rare case in which an improper

26    /////

1  instruction will justify reversal of a criminal conviction when no objection has been made in the

2  trial court." *Henderson*, 431 U.S. at 154.  Petitioner has failed to meet his heavy burden.

3      For the reasons set forth above, petitioner is not entitled to federal habeas relief on these

4  jury instruction claims.

5              **b.      Failure to Instruct on Propensity Evidence**

6      In his next claim for relief, petitioner argues that the trial court violated his right to due

7  process in failing to give a requested jury instruction to the effect that his "extensive gun

8  collection" should not be considered as evidence against him on the murder charge.  ECF No. 15

9  at 13.  Petitioner argues the prosecutor exacerbated the trial court's failure to give this instruction

10 by informing the jury during his closing argument that petitioner's gun collection was "evidence

11 of a violent character." *Id.*  He contends that his gun collection "had nothing to do with the

12 shooting and proves only that I owned a gun collection." *Id.*

13     The California Court of Appeal rejected these arguments, reasoning as follows:

14          In addition to murder, Bortis was charged with illegal possession
            of two machine guns, four assault rifles, and armor-piercing
15          ammunition.  At trial, the prosecution introduced evidence of
            Bortis's extensive collection of guns and ammunition, comprising
16          about 50 firearms in addition to his illegal weapons.  The court
            admitted the evidence without limitation.
17
            Bortis contends the trial court erred in refusing to instruct the jury
18          as follows:  "The only gun which is relevant evidence to the
            murder charge is the gun which was actually used by Gary Bortis
19          to shoot Lawrence Ficarra.  You are instructed not to consider any
            of the other guns possessed by [defendant] Bortis as evidence
20          against him in the murder charge."  We reject the contention.

21          **A**

22          Bortis relies on *People v. Riser* (1956) 47 Cal.2d 566, 305 P.2d 1 (
            Riser ) [*overruled on other grounds* in *People v. Morse* (1964) 60
23          Cal.2d 631, 649] to contend the firearm evidence was not relevant
            to proving he committed premeditated murder.  In *Riser*, the
24          California Supreme Court held that "[w]hen the specific type of
            weapon used to commit a homicide is not known, it may be
25          permissible to admit into evidence weapons found in the
            defendant's possession some time after the crime that could have
26          been the weapons employed."  (*Id.* at p. 577, 305 P.2d 1.)

However, the *Riser* court also admonished: "When the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Ibid.*) Bortis emphasizes this cautionary language in assigning error to the trial court's failure to preclude the jury from considering evidence of guns other than the murder weapon itself on the question of whether he murdered Ficarra.

In *People v. Smith* (2003) 30 Cal.4th 581, 134 Cal.Rptr.2d 1, 68 P.3d 302, the California Supreme Court clarified its holding in *Riser* to explain that weapons not directly used in the commission of the charged crime nonetheless may constitute relevant evidence. The defendant in *Smith* challenged the admission of a gun and ammunition belonging to him but which did not match the description of the murder weapon. (*Id.* at p. 613, 134 Cal.Rptr.2d 1, 68 P.3d 302.) Relying on *Riser*, defendant contended that the admission into evidence constituted error. (*Ibid.*) The high court rejected the argument, explaining that the "evidence did not merely show that defendant was the sort of person who carries deadly weapons, but it was relevant to his state of mind when he shot [the victim]." (*Ibid.*) The defense claimed defendant intended to employ a gun only to intimidate but not to shoot the victim. (*Ibid.*) However, the evidence showed defendant "possessed another small, easily concealed but unloaded gun and no ammunition" suitable for the same purpose. (*Id.* at pp. 613-614, 134 Cal.Rptr.2d 1, 68 P.3d 302 .) Although not employed in the shooting, the unloaded gun was relevant because "[a]n unloaded gun fully serves to intimidate; a loaded gun is necessary only to actually shoot. Thus, although the ammunition and derringer were not used in the killing, '[t]heir circumstantial relevancy . . . seems clear,' and they were, accordingly, properly admitted." (*Ibid.*, quoting *People v. Lane* (1961) 56 Cal.2d 773, 785, 16 Cal.Rptr. 801, 366 P.2d 57.)

Similarly, in *People v. Jablonski* (2006) 37 Cal.4th 774, at page 822, 38 Cal.Rptr.3d 98, 126 P.3d 938, the Supreme Court held that homemade handcuffs and a stun gun recovered from the defendant's vehicle, but not used during the murder, were relevant in proving premeditation. As the *Jablonski* court explained, "premeditation was a disputed fact and evidence that defendant carried devices to the crime scene that could have been used to restrain or immobilize the victims was relevant to premeditation." (*Id.* at p. 821, 38 Cal.Rptr.3d 98, 126 P.3d 938.) Accordingly, the high court held that these items' relevance did not compel their exclusion from evidence. (*Id.* at pp. 822-823, 38 Cal.Rptr.3d 98, 126 P.3d 938.)

In this case, the prosecution argued that the loaded guns kept by Bortis throughout his house tended to prove premeditation because they showed Bortis was obsessed with winning the boundary

contest and confrontations with Ficarra.  During closing arguments, the prosecution stated: "Motive, planning and the manner of killing.  How does the manner suggest deliberation and careful reasoning of consequences against and knowledge of the consequences?  This he – what the firing of those 11 shots demonstrates is the intensity of Bortis's desire to see [ ] Ficarra die, and that that's the significance of those 11 shots.  He had been – he had been feeding this motive of his.  It was a contest of wills.  He did not want to see the property developed, and he was obsessed with using fire power to make sure that he would win this test of wills.  He had loaded guns everywhere, not just the small of his back."

As evidence of motive and premeditation, the guns were relevant to the charge of murder.  (*See People v. Prince* (2007) 40 Cal.4th 1179, 1249-1250, 57 Cal.Rptr.3d 543, 156 P.3d 1015 [evidence of defendant's obsession with knives relevant to the question of premeditation].)

**B**

Even if the trial court had erred in failing to give Bortis's requested limiting instruction, the error would have been harmless.  (*People v. Watson, supra*, 46 Cal.2d at p. 836, 299 P.2d 243.)  It is not probable that Bortis's proposed limiting instruction would have yielded a result more favorable to him. Bortis testified that he told Mendocino that he carried a gun whenever he was outside his house in case he ran into Ficarra.  That Bortis might have had additional firearms at his disposal inside the house added little to the evidence that he carried a handgun with 11 live rounds for the express purpose of being armed during any run-in with Ficarra.  Accordingly, any error in the trial court's refusal to give the requested limiting instruction was harmless.

ECF No. 24 at 59-60.[6]

Assuming *arguendo* that the trial court erred in failing to give petitioner's requested jury instruction, petitioner is not entitled to relief on this claim.  The state court's conclusion that any error in failing to give the instruction was harmless given petitioner's damaging admission that he carried a loaded gun on his person, which he chose from among several guns in his possession, "for the express purpose of being armed during any run-in with Ficarra," was not

---

[6]  Justice Butz also dissented from this portion of the Court of Appeal's opinion.  *Id.* at 66-67.

1   unreasonable.  *See* ECF No. 24 at 60; Reporter's Transcript on Appeal (RT) at 1449-50.  In any

2   event, this court may not grant habeas relief to petitioner if 'fairminded jurists could disagree' on

3   the correctness of the state court's decision" in this regard  *Richter*, 131 S. Ct. at 786.  The

4   reasoned opinions of the majority and the dissent in this case illustrate that, on this issue,

5   fairminded jurists could disagree on whether the trial court violated petitioner's right to a fair

6   trial by refusing to give petitioner's requested jury instruction.  Accordingly, petitioner is not

7   entitled to relief on this claim.[7]

8             **c.**       **Failure to Instruct that Direct Evidence Must be Proved Beyond a Reasonable Doubt**

9

10         In his next ground for relief, petitioner claims that the trial court violated his right to due

11   process in failing to instruct the jury that "direct evidence had to be proven beyond a reasonable

12   doubt." ECF No. 28 at 8.  Petitioner notes that while the jury was instructed that circumstantial

13   evidence had to be proven beyond a reasonable doubt, it was not given a similar instruction with

14   regard to direct evidence.  *Id.* at 9.  Petitioner argues that such an instruction would have been

15   particularly helpful in this case, given that the jury asked for a definition of first degree murder

16   "in layman's terms" and for a read-back of Tracy Baker's testimony.  *Id. See also* Clerk's

17   Transcript on Appeal (CT) at 407-08.  He further argues that the trial court's failure to give the

18   /////

19

20        [7]  Petitioner does not appear to be claiming that the trial court erred in admitting evidence
of his gun collection.  Even if he is making such a claim, he is not entitled to relief.  "Under

21   AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair
may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established

22   Federal law,' as laid out by the Supreme Court."  *Holley v. Yarborough*, 568 F.3d 1091, 1101
(9th Cir. 2009).  *See also Greel v. Martel*, No. 10-16847, 472 Fed.Appx. 503, 504, 2012 WL

23   907215, *1 (9th Cir. Mar. 19, 2012) ("There is likewise no clearly established federal law that
admitting prejudicial evidence violates due process.").  In light of these authorities, any claim

24   that the trial court violated petitioner's right to due process in allowing the prosecutor to
introduce evidence of petitioner's extensive gun collection does not support habeas relief under

25   AEDPA.  There is no "clearly established federal law" that the admission into evidence of a
defendant's possession of numerous firearms in a murder prosecution violates the due process

26   clause.

instruction violated his right "to a constitutionally fair trial by undercutting the presumption of

innocence and the requirement of proof beyond a reasonable doubt, by removing it altogether."

ECF No. 28 at 10.

>    The California Court of Appeal rejected these arguments, reasoning as follows:

>    The trial court instructed Bortis's jury with CALCRIM No. 224 as follows:

>    "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

>    "Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

>    Bortis recognizes that CALCRIM No. 224 correctly instructs on circumstantial evidence when it cautions the jury that such evidence must prove guilt beyond a reasonable doubt.  However, Bortis contends the instruction is deficient because it fails to direct the same caution to direct evidence.  Bortis reasons the jury might have convicted him only on the direct evidence provided by percipient witness Tracy Baker – testimony that Bortis asserts to have been insufficient to establish guilt beyond a reasonable doubt.

>    In so arguing, Bortis acknowledges this court's rejection of challenges to CALCRIM No. 224 in *People v. Anderson* (2007) 152 Cal.App.4th 919, 61 Cal.Rptr.3d 903 (*Anderson*), as well as the same result reached by the Fifth District in *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 67 Cal.Rptr.3d 871 (*Ibarra*).  Bortis urges us to depart from these decisions because (1) their discussion of direct evidence conflicts with the California Supreme Court's prior decision in *People v. Vann* (1974) 12 Cal.3d 220, 115 Cal.Rptr. 352, 524 P.2d 824 (*Vann*), and (2) the discussion of CALCRIM No. 224's application to direct evidence constituted nothing more than dicta in *Anderson* and *Ibarra*.  We reject Bortis's contentions.

>    In an argument virtually indistinguishable from Bortis's, the defendant in *Anderson* contended "because this instruction is limited to circumstantial evidence and sets forth basic reasonable

doubt and burden of proof principles, it gives the false impression these principles apply only to circumstantial evidence, not direct evidence." (*Anderson, supra*, 152 Cal.App.4th at p. 931, 61 Cal.Rptr.3d 903.)

This court rejected the argument, explaining that "CALCRIM No. 224 does not set out basic reasonable doubt and burden of proof principles; these are described elsewhere. Although the instruction reiterates that each fact necessary for conviction must be proved beyond a reasonable doubt, the obvious purpose of the instruction is to limit the use of circumstantial evidence in establishing such proof. It cautions the jury not to rely on circumstantial evidence to find the defendant guilty unless the only reasonable conclusion to be drawn from it points to the defendant's guilt. In other words, in determining whether a fact necessary for conviction has been proved beyond a reasonable doubt, circumstantial evidence may be relied on only if the only reasonable inference that may be drawn from it points to the defendant's guilt.

"The same limitation does not apply to direct evidence. Circumstantial evidence involves a two-step process: presentation of the evidence followed by a determination of what reasonable inference or inferences may be drawn from it. By contrast, direct evidence stands on its own. It is evidence that does not require an inference. Thus, as to direct evidence, there is no need to decide whether there is an opposing inference that suggests innocence." (*Anderson, supra*, 152 Cal.App.4th at p. 931, 61 Cal.Rptr.3d 903.)

In *Ibarra*, the Court of Appeal similarly came to the conclusion that defendant in that case wrongly assumed "that circumstantial evidence and direct evidence are similarly situated, but that is not so. Circumstantial evidence involves a two-step process – first, the parties present evidence and, second, the jury decides which reasonable inference or inferences, if any, to draw from the evidence – but direct evidence stands on its own. So as to direct evidence no need ever arises to decide if an opposing inference suggests innocence." (*Ibarra, supra*, 156 Cal.App.4th at p. 1187, 67 Cal.Rptr.3d 871, *citing Anderson, supra*, 152 Cal.App.4th at p. 931, 61 Cal.Rptr.3d 903.)

Regardless of whether the pertinent portions of *Anderson* and *Ibarra* constituted dicta or not, we find the reasoning to be sound and adopt it here.

We further conclude that neither *Anderson* nor *Ibarra* runs afoul of the California Supreme Court's conclusion in *Vann* that "that the trial court prejudicially erred when it failed to instruct the jury on the prosecution's burden to prove guilt beyond a reasonable doubt." (*Vann, supra*, 12 Cal.3d 220, 222-223, 115 Cal.Rptr. 352, 524 P.2d 824.) In contrast to *Vann*, in which the jury received no instruction defining the prosecution's burden to prove guilt beyond

a reasonable doubt, the jury in *Anderson*, and this case did receive such instruction.  (*Compare Vann, supra,* at pp. 222-223, 227-228, 115 Cal.Rptr. 352, 524 P.2d 824 with *Anderson, supra,* 152 Cal.App.4th at p. 931, 61 Cal.Rptr.3d 903; *Ibarra, supra,* 156 Cal.App.4th at p. 1185, 67 Cal.Rptr.3d 871.)

The fundamental flaw in Bortis's argument lies in overlooking CALCRIM No. 220,FN4 with which the trial court properly instructed the jury to acquit unless the prosecution proved Bortis's guilt beyond a reasonable doubt.  "[C]hallenged instructions "'may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.'" (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 365, 100 Cal.Rptr.3d 820, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 [116 L.Ed.2d 385].)  Viewed as a whole, the jury instructions precluded the jury from convicting Bortis on the basis of direct evidence if it failed to establish his guilt beyond a reasonable doubt.

> FN4. The court instructed the jury with CALCRIM No. 220 in pertinent part as follows:  "A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove each element of a crime and special allegation beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.  [¶]  Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.  [¶]  In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to an acquittal and you must find them not guilty."

Accordingly, the trial court did not err in instructing the jury with CALCRIM No. 224.

ECF No. 24 at 60-62.

Here, in light of the entire charge to the jury, the giving of CALCRIM No. 224 without a corresponding instruction with respect to direct evidence did not lower the prosecution's burden of proof.  As noted by the California Court of Appeal, petitioner's jury was also instructed with

1   CALCRIM No. 220, which stated that petitioner was presumed innocent and that the prosecution

2   was required to prove each element of the charged crimes and each special allegation beyond a

3   reasonable doubt. CT at 418. The jury was also given CALCRIM No. 200, which instructed:

4   "Pay careful attention to all of these instructions and consider them together." *Id.* at 414.  The

5   jury is presumed to have followed these instructions. *Weeks v. Angelone*, 528 U.S. 225, 234

6   (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).  The court also notes that

7   CALCRIM No. 224 was intended to guide the jury's consideration of circumstantial evidence

8   alone and did not purport to override the general instructions on reasonable doubt.  There is no

9   evidence the jury did not understand that the prosecution had to prove all of the charges against

10  petitioner beyond a reasonable doubt regardless of the whether the evidence in support of those

11  charges was direct or circumstantial.  For these reasons, petitioner has failed to demonstrate that

12  the trial court violated his right to due process in failing to instruct the jury that "direct evidence

13  had to be proven beyond a reasonable doubt." *See Williams v. Junious*, No. CV 10-500-PSG

14  (OP), 2010 WL 5624640 (C.D. Cal. Sept. 13, 2010) (rejecting identical claim).  Accordingly, he

15  is not entitled to relief on this claim.

16              **2.  <u>Motion to Suppress Evidence of Guns Found in the House</u>**

17          Petitioner claims that the trial court violated his Fourth Amendment right to be free from

18  unreasonable searches and seizures when it denied his motion to suppress evidence of the

19  weapons found in his home.  ECF No. 15 at 16-18.  He argues that the search, which was

20  conducted without a warrant, could not be "justified as a protective sweep." *Id.* at 16.  The

21  California Court of Appeal denied this claim, finding that the trial court did not err in denying

22  petitioner's motion to suppress because "the deputies acted reasonably in conducting a protective

23  sweep of the house."   ECF No. 24 at 58-59.

24          The United States Supreme Court has held that "where the State has provided an

25  opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be

26  granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional

search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976).  There

is no evidence before the court that petitioner did not have a full and fair opportunity to litigate

his Fourth Amendment claims in state court.  On the contrary, petitioner filed a motion to

suppress in the trial court and received a hearing on that motion.  CT at 252-60, 317, 325.

Because petitioner had a fair opportunity to and did, in fact, litigate his Fourth Amendment

claims in state court, his Fourth Amendment claim is barred in this federal habeas proceeding.

*Stone*, 428 U.S. at 494.

### 3. Ineffective Assistance of Trial and Appellate Counsel

Petitioner claims that his trial and appellate counsel rendered ineffective assistance

through numerous errors of counsel.  Petitioner's claims of ineffective assistance of counsel were

raised in a petition for writ of habeas filed in the California Supreme Court, which was

summarily denied.  Where, as here, the state court provides no reasoning to support its decision,

a federal court must review the state court record to determine whether there was any

"reasonable basis for the state court to deny relief." *Richter*, 131 S.Ct. at 784.  The court must

"determine what arguments or theories . . . could have supported, the state court's decision; and

then it must ask whether it is possible fairminded jurists could disagree that those arguments or

theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 786.

Using these standards, and after setting forth the applicable legal principles, the court will

evaluate petitioner's ineffective assistance of counsel claims in turn below.

To support a claim of ineffective assistance of counsel, a petitioner must first show that,

considering all the circumstances, counsel's performance fell below an objective standard of

reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  After a petitioner

identifies the acts or omissions that are alleged not to have been the result of reasonable

professional judgment, the court must determine whether, in light of all the circumstances, the

identified acts or omissions were outside the wide range of professionally competent assistance.

*Id.* at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  "Counsel's errors must be 'so serious as

34

to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88. (quoting *Strickland*, 466 U.S. at 687).  Surmounting the bar imposed by *Strickland* was "never an easy task," and "establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* at 788.

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S.Ct. at 792. *See also Gulbrandson v. Ryan*, 711 F.3d 1026, 1037 (9th Cir. 2013).

The *Strickland* standards apply to appellate counsel as well as trial counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).  However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed." *Id*.  Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." *Id. See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.")  There is, of course, no obligation to raise meritless arguments on a client's behalf. *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing to raise a weak issue. *See Miller*, 882 F.2d at 1434.  In order to establish prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. *Id*. at 1434 n.9.

### a.  Failure to Challenge Search of his Home

Petitioner claims that his trial counsel improperly failed to challenge the search of his home. ECF No. 15 at 19.  He claims that counsel told him he "wasn't going to fight the gun charges" because they were "not his thing."  *Id.*  Petitioner also states that he told his trial counsel the police "staged a photo" of officers giving CPR to the victim twenty minutes after he died, in order to justify a protective sweep of petitioner's house.  *Id.*  Petitioner argues that his trial counsel could have prevailed on a motion to suppress by presenting "the staged photo and conflicting reports on the record."  *Id.*

As set forth above, the state court record reflects that petitioner's trial counsel did file a motion to suppress the evidence seized during the search of petitioner's home, and received a hearing on that motion.  CT at 252-60, 317, 325.  Accordingly, any claim that trial counsel rendered ineffective assistance in failing to challenge the search of petitioner's home lacks a factual basis and must be denied.  With regard to petitioner's other allegations, there is no evidence before this court that counsel's performance in prosecuting the motion to suppress was deficient.  To the extent photographs or "conflicting reports" exist that would support petitioner's claim in this regard, he failed to present them to this court or to the California Supreme Court.  Under these circumstances, petitioner has failed to show that his trial counsel's performance with respect to the motion to suppress was in any way "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.   Accordingly, he is not entitled to relief on this claim.

### b.  Interview of Keith Henry

Petitioner claims that his trial counsel rendered ineffective assistance in failing to interview Keith Henry, a neighbor and "key defense witness," who died prior to the trial.  ECF No. 15 at 19.  Petitioner states that Mr. Ficarra had previously invaded Mr. Henry's home and threatened to kill him.  *Id.*

/////

1      Even assuming *arguendo* that petitioner's trial counsel improperly failed to interview Mr.

2  Henry prior to trial, petitioner has failed to demonstrate prejudice with respect to this claim.

3  Petitioner does not provide any evidence of what Mr. Henry would have said on the witness

4  stand. This failure precludes a finding of prejudice. *See United States v. Berry*, 814 F.2d 1406,

5  1409 (9th Cir. 1987) (appellant failed to meet prejudice prong of ineffectiveness claim because

6  he offered no indication of what potential witnesses would have testified to or how their

7  testimony might have changed the outcome of the hearing). Petitioner's unsupported statement

8  that Mr. Ficarra invaded Mr. Henry's house and threatened him is insufficient to establish that

9  Mr. Henry would have given testimony helpful to the defense. The same is true with regard to

10  any statements Mr. Henry might have given about what he saw, if anything, during the

11  altercation between petitioner and Ficarra. Finally, the court notes that there was significant

12  testimony at petitioner's trial regarding Mr. Ficarra's violent and irrational behavior and his poor

13  relations with neighbors. Testimony from one more witness on this subject would not have led

14  to a different verdict at trial.

15      Because petitioner has failed to demonstrate prejudice, he is not entitled to relief on this

16  claim.

17            **c.**      **Restraining Orders against Victim**

18      Petitioner next claims his trial counsel told him that restraining orders petitioner had

19  obtained against Mr. Ficarra were inadmissible hearsay and refused to "present them as

20  evidence," even though the orders "proved" that Ficarra had previously threatened petitioner and

21  was in violation of a restraining order on the day of the killing. ECF No. 15 at 20.

22      There is no evidence that petitioner presented the restraining orders in question to the

23  California Supreme Court for its review, and they have not been filed with this court.

24  Petitioner's conclusory and unsubstantiated claims regarding the restraining orders and/or

25  whether Mr. Ficarra was in violation of those orders at the time of the shooting are insufficient to

26  support this claim of ineffective assistance of counsel. *See Jones v. Gomez*, 66 F.3d 199, 204

1   (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by a statement of specific

2   facts do not warrant habeas relief'") (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)).

3   The court also notes that the California Supreme Court could have reasonably concluded that

4   allegations contained in an application for restraining order were inadmissible at petitioner's

5   trial, or that petitioner had failed to allege sufficient facts or evidence to support this claim of

6   ineffective assistance of counsel.  Because petitioner has failed to show that there was no

7   reasonable basis for the state court to deny him relief on this claim, it should be denied.

8                              **d.      911 Tape**

9          Petitioner's next claim for relief is stated as follows:

10                 [Petitioner's trial counsel] had a copy of the tape from the 911 call
                   where the watch commander told the deputy not to bother because
11                 "Mr. Bortis) is 5150" – this was the same time <u>we</u> called 911 and
                   Ficarra was attacking Maryanne with a hammer.  This was <u>crucial</u>
12                 evidence to prove I wasnt trying to kill Ficarra and was defending
                   my wife.
13

14   ECF No. 15 at 20.

15         Petitioner has failed to provide evidence concerning the 911 call to this court and has

16   failed to explain how admission of the call would have led to a different result at trial.  Petitioner

17   is not entitled to relief on this vague, confusing, and unsupported claim.  *Jones*, 66 F.3d at 204;

18   *James*, 24 F.3d at 26.

19                        **e.      Testimony of Tracy Baker**

20         In his next claim for relief, petitioner argues that his trial counsel rendered ineffective

21   assistance in failing to inform the jury that the testimony of prosecution witness Tracy Baker was

22   unreliable because her view of the events was obstructed by "an R.V. and a hedge."  ECF No. 15

23   at 20.  In the traverse, petitioner has attached several photocopies of photographs of what purport

24   to be the crime scene from several vantage points.  ECF No. 28 at 21-23.  Petitioner states that

25   these pictures were taken two weeks after the shooting occurred and that "all the vehicles had

26   /////

1  not been moved, it is as it was that day." *Id.* at 18. Petitioner asserts that Baker's view would

2  have been blocked by an R.V., trees, and a hedge. *Id.*

3        During petitioner's trial, Baker testified that: (1) at one point during the altercation she

4  had to move her truck to get a better view; (2) she had to move to the right because she "couldn't

5  see anything past the vehicle;" (3) she was not able to see Maryanne's movements after the

6  shooting because "the bushes are in the way;" and (4) that one of petitioner's vehicles was

7  blocking her view. RT at 947, 953, 968. In light of Baker's testimony in this regard, petitioner

8  has failed to show how the admission of photographs showing that Baker's view of the scene

9  was obstructed would have changed the outcome of the trial. Baker had already so testified.

10  Because petitioner has failed to demonstrate prejudice, he is not entitled to relief on this claim.

11             **f.**        **Preparation for Testimony**

12        Petitioner claims that his trial counsel "put me on the witness stand <u>without</u> consulting

13  me about it first and (thus) I was WITHOUT A CLUE what questions would be asked or how I

14  was to behave." ECF No. 15 at 20.

15        This claim is vague and conclusory and should be denied on that basis. *Jones*, 66 F.3d at

16  204; *James*, 24 F.3d at 26. Petitioner has failed to explain how further consultation about his

17  trial testimony would have changed either the substance of his testimony or the outcome of the

18  trial. Accordingly, he is not entitled to federal habeas relief.

19            **g.**        **Computer Reconstruction of the Crime Scene**

20        Petitioner claims that his trial counsel rendered ineffective assistance in failing to obtain

21  a computer reconstruction of the crime scene, even though he paid counsel $30,000 to do so.

22  ECF No. 15 at 20. He also complains that trial counsel "did not even blow up the picture of

23  Ficarra attacking Maryanne with a pipe and hammer which was key to my defense." *Id.*

24        Petitioner has failed to demonstrate that a computer reconstruction of the crime scene or

25  the admission into evidence of a photograph of Ficarra attacking Maryanne, neither of which

26  have been provided to this court, would have led to a different result at trial. Petitioner's

1   unsupported assertion that a computer reenactment would have "clarified everything" is

2   insufficient to establish prejudice.  *See* ECF No. 28 at 18.  Accordingly, he is not entitled to

3   relief on these claims.

4                    h.      **Claims Raised in the Traverse**

5          In his traverse, petitioner claims that his trial counsel rendered ineffective assistance in

6   failing to investigate or introduce evidence that, prior to the shooting of Ficarra, he was on

7   medical leave from his place of employment for post-traumatic stress disorder.  ECF No. 15 at

8   20.  In support of this claim, petitioner has filed a copy of a letter dated May 16, 2012 from a

9   clinical psychologist at California State Prison, Solano, who states that petitioner has been and is

10  currently being treated for Post-Traumatic Stress Disorder "arising from a traumatic event which

11  occurred prior to the instant offense."  *Id.* at 23.  The psychologist states that petitioner told her

12  evidence of the traumatic event and resulting mental illness was not "introduced to the court as a

13  factor in his defense."  *Id.*  She believes this is "an important factor for the court to consider."

14  *Id.*

15         Petitioner also claims in the traverse that his trial counsel rendered ineffective assistance

16  in failing to introduce "the other photographs" of Mr. Facarra's "many other physiccal [sic]

17  assault"s [sic]."  *Id.* at 20.

18         Neither of these claims was raised in the petition filed in this court.  Of course, a traverse

19  is not the proper pleading in which to raise additional grounds for relief.  *Cacoperdo v.*

20  *Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994); *see also Greenwood v. Fed. Aviation Admin.*, 28

21  F.3d 971, 977 (9th Cir. 1994) ("we review only issues which are argued specifically and

22  distinctly in a party's opening brief").  Moreover, the claims do not appear to have been raised in

23  the California Supreme Court and are therefore unexhausted.

24         In general, a federal court will not grant a state prisoner's application for a writ of habeas

25  corpus unless "the applicant has exhausted the remedies available in the courts of the State."  28

26  U.S.C. § 2254(b)(1).  However, an unexhausted claim may be denied on the merits.  *See* 28

                                                        40

1  U.S.C. § 2254(b)(2).  Assuming *arguendo* that petitioner's two claims of ineffective assistance

2  of counsel raised in the traverse were exhausted in state court, they should be denied for failure

3  to show prejudice.

4          Petitioner has failed to show, with respect to either claim, how admission of the evidence

5  he describes would have led to a different result at trial.  He does not explain or provide any

6  evidence how or whether Post-Traumatic Stress Disorder affected his actions during the

7  altercation with Mr. Ficarra or even whether his trial counsel knew he was suffering from this

8  disorder.  The mere fact, standing alone, that petitioner suffers from Post-Traumatic Stress

9  Disorder does not establish prejudice.  Similarly, there is no evidence before this court that

10  admission of unexplained photographs, which have not been provided to the court, would have

11  changed the outcome of petitioner's trial.  For these reasons, petitioner is not entitled to relief on

12  these claims.[8]

13                          i.      **Ineffective Assistance of Appellate Counsel**

14          Petitioner's final claim is that his appellate counsel rendered ineffective assistance in

15  failing to raise a claim of ineffective assistance of trial counsel on appeal.  ECF No. 15 at 21.  He

16  states that appellate counsel "put all this off, saying that it may be useful <u>after</u> the state appeal

17  was exhausted and wanted me to pay $40,000 to bring it to the Federal Court."  *Id.*

18          This court has concluded that the claims of ineffective assistance of trial counsel

19  contained in the instant petition are not meritorious.  Accordingly, for the reasons described

20  above, petitioner cannot demonstrate that he probably would have prevailed if his appellate

21  counsel had raised these claims on appeal.  *See Jones v. Ryan*, 691 F.3d 1093, 1101 (9th Cir.

22

23          [8]  Petitioner also informs the court that his trial counsel "lied" about his "age and
experience," failed to give petitioner a statement indicating the money spent on petitioner's
defense, and did not visit petitioner enough prior to his trial.  ECF No. 15 at 21.  These

24  statements fail to state a claim for relief.  As noted by respondent, "The Sixth Amendment does
not guarantee a 'meaningful relationship' between an accused and his counsel."  *Larson v.*

25  *Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (quoting *Morris v. Slappy*, 461 U.S. 1, 13-14
(1983)).  There is no evidence that these failures by trial counsel had any significant impact on

26  the outcome of petitioner's trial.

1   2012) ("It should be obvious that the failure of an attorney to raise a meritless claim is not

2   prejudicial").  Appellate counsel's decision not to include these claims in petitioner's direct

3   appeal in state court, but instead to focus on claims that counsel believed were more meritorious,

4   was "within the range of competence demanded of attorneys in criminal cases." *McMann v.*

5   *Richardson*, 397 U.S. 759, 771 (1970).  Accordingly, petitioner is not entitled to relief on his

6   claim that his appellate counsel rendered ineffective assistance.

7   **III.  Conclusion**

8         For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

9   application for a writ of habeas corpus be denied.

10        These findings and recommendations are submitted to the United States District Judge

11  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

12  after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

15  within the specified time may waive the right to appeal the District Court's order. *Turner v.*

16  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

17  his objections petitioner may address whether a certificate of appealability should issue in the

18  event he files an appeal of the judgment in this case. *See* Rule 11, Federal Rules Governing

19  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

20  enters a final order adverse to the applicant).

21  DATED:   August 6, 2013.

22

23                                EDMUND F. BRENNAN
                                  UNITED STATES MAGISTRATE JUDGE
24

25

26

                                        42